UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____x

Philip Gabel and Tina Gabel on behalf of their
child, L.G., a student with a disability,

           Plaintiffs,                             04 Civ. 510 (CM)

        -against-

Board of Education of the Hyde Park Central
School District,

           Defendant.

_____x


MEMORANDUM DECISION GRANTING IN PART PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AND DENYING IN FULL DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

McMahon, J.

      In this action brought pursuant to the Individuals with Disabilities in Education Act, 20

U.S.C. § 1400 *et seq*. (IDEA), the parents of L.G., a disabled student, seek reimbursement for

tuition they paid for their daughter to attend the Randolph School for the 2000-2001 school year.

The Impartial Hearing Officer (IHO) assigned to preside at the hearing on the Gabels' complaint

concluded that plaintiffs were entitled to tuition reimbursement; that finding was subsequently

overturned by the State Review Officer (SRO) assigned to the case.

      For the reasons stated below, plaintiffs' motion for summary judgment on the issue of

tuition reimbursement is granted, and the SRO's decision denying tuition reimbursement is

overturned. The District's cross motion seeking affirmance of the SRO's decision on the merits

is denied. The SRO's determination regarding his jurisdiction to consider plaintiffs' claim for the

reimbursement of certain "related services" (which he awarded to the parents) must be vacated,

because the SRO concluded erroneously that federal law gave plaintiffs a right to a due process hearing on this issue. However, defendant's cross motion for reinstatement of the IHO's decision dismissing the claim for related services reimbursement must be denied, because, under state law, the IHO did indeed have jurisdiction to consider that claim. The issue of "related services" is remanded to the SRO for further consideration  See, e.g., Nichols v. Prudential Ins. Co. of America, — F. 3d —, No. 04-1445-CV, 2005 WL 913762 (2d Cir. April 21, 2005) (discussing district court's ability to remand issues to an administrative agency). However, for the reasons set forth below, any appeal from his administrative decision will have to be directed to the New York State Commissioner of Education.

Plaintiffs also assert a claim of discrimination against the defendant District pursuant to § 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 (Section 504). Because they allege more than a mere IDEA violation, defendant's motion for summary judgment dismissing that claim is denied.

**Facts**

L.G. was born on September 3, 1984. She has resided in the Hyde Park Central School District. She was diagnosed with a severe communication speech disorder during pre-school.

For most of her elementary school years, L.G. attended a Dutchess County BOCES-operated communication disorder program at Nassau Elementary School, located in the Spackenkill Union Free School District.  She remained in that program through the end of the 1997-98 school year.

At the annual review conducted by the District's Committee on Special Education (CSE), held on June 16, 1998, it was recommended that L.G. be placed in a District-run program at the

Haviland Middle School in regular sixth grade classes, with consultant teacher support for all subjects, five periods of resource room per week, and related services consisting of intensive speech/language therapy services to address articulation and language deficits, counseling and occupational therapy. In September 1998, L.G. would have been 14 years old, or about 2-3 years older than the average sixth grader.

During the 1998-99 school year, the CSE convened several times and additional evaluations were reviewed. As a result, additional services were added to L.G.'s program, including occupational therapy and oral-motor therapy.

In June 1999, Teresa Buso, L.G.'s special education teacher, administered a Woodcock-Johnson Test of Achievement to L.G. These scores were available to the CSE when it met for the annual review on July 1, 1999. At that time, the CSE recommended that L.G. continue at the Haviland Middle School for the 1999-2000 school year, but with a number of changes to her Individualized Education Plan (IEP), including: a special 12:1:1 program[1] for English and Social Studies; a regular class for math and science with the services of a direct consultant teacher five days per week; and a number of related services, including: six hours per week of speech/language therapy (some individual and some group therapy); one counseling session per week; two sessions of occupational therapy per week; and monthly oral-motor speech therapy on a consultation basis. The CSE also recommended a summer program of related services, including speech/language therapy and oral-motor therapy consults.

---

[1] A 12:1:1 program is a self-contained special education classroom where "the maximum class size for special classes containing students whose management needs interfere with the instructional process to the extent that an additional adult is needed within the classroom to assist in the instruction of such students, shall not exceed 12 students, with at least one para-professional assigned to each class during periods of instruction."  8 N.Y.C.R.R. § 200.6(g)(4).

The parents rejected the District's proposed placement of L.G. They were unhappy with their daughter's experience the prior year. Furthermore, the class proposed for her was a self-contained class comprised solely of boys with behavioral problems. Instead, they unilaterally enrolled their daughter at the Randolph School, a private school located near Wappingers Falls, New York (i.e., out of district). Randolph provides small class sizes with individualized and small group instruction for its students. Randolph is not approved by the State of New York for the provision of special education services to students with disabilities. It is, however, chartered by the New York States Board of Regents.

Plaintiffs requested an impartial hearing contesting the CSE's proposal for their daughter for the 1999-2000 school year and seeking tuition reimbursement for the expense of placing their daughter at Randolph.

The dispute was eventually compromised by the signing of a Settlement Agreement. The Settlement Agreement provided, in pertinent part:

> 1. The District shall pay to the Parents the sum of Eight Thousand, Seven Hundred Fifty Dollars ($8,750) in full settlement of any claims for tuition reimbursement, damages, or attorney's fees for the placement of the student for the 1999-00 school year. Such payment shall be made to the Parents within ten (10) days of the District's execution of this Agreement.

> 2. The District shall provide teacher training materials to the individuals who provide educational services to the Parents' child to assist in the understanding of the child's disability, how the disability impacts her access to education, and what appropriate interventions and accommodations are to be utilized to address her needs. . .

> 3. The District shall arrange and pay for a central auditory processing evaluation of the Parents' daughter.

> 4. The District shall provide speech therapy and oral-motor therapy services to Parents' daughter at the Randolph School for the remainder of the 1999-00 school year at a frequency and duration of ninety (90) minutes, two times per

week for individual language services in a separate or integrated setting at the discretion of the therapist; sixty (60) minutes, three times per week for individual oral motor and language services in a separate location. . .

5. The District shall provide occupational therapy services to Parents' daughter at the Randolph School for the remainder of the 1999-00 school year. . .

13. The District and Parents agree that the District's Committee on Special Education shall convene to initiate the Parents' daughter's annual review meeting for the creation of the child's Individualized Education Plan for the 2000-01 school year on March 29, 2000. . . and shall continue such at meetings scheduled thereafter at the mutual convenience of the attendees. In advance of such meeting the District shall provide to the Parents information as to all programs that would be appropriate to consider for the child's placement for the 2000-01 school year. . .

16. This Agreement constitutes the entire understanding of the parties hereto with respect to the subject matter of the parties' dispute and supercedes any previous agreements whether oral or in writing.

The Agreement also provides for responsibility for testing and services in connection therewith. Under settled principles of contract construction, all prior discussions are merged into the Settlement Agreement; indeed, the document itself so states, at Paragraph 16.

Pursuant to the Settlement Agreement, the District began providing L.G. with speech therapy, oral motor therapy and occupational therapy at the Randolph School. Prior to the Settlement Agreement, the District had not been providing L.G. with any of the related services that were recommended in her IEP.

The CSE met on April 12, 2000 to recommend a program for L.G. for the 2000-01 school year. A number of placements were discussed, including the District's Franklin Delano Roosevelt High School and the BOCES programs in the Arlington and Spackenkill High Schools. These were all age-appropriate placements, since L.G. would be 16 years old during the 2000-01 school year. Plaintiffs agreed to observe classes at FDR High School. However,

plaintiffs demanded information about demographics and program options before they would consent to any referral to an out-of-district program.[2]  Plaintiffs could only observe classes at out-of-district programs after a referral was made, and the District apparently failed to provide the requested data prior to the end of the 1999-2000 school year.[3]  This resulted in a stalemate between plaintiffs and the District, and meant that the parents could not visit any out-of-district BOCES program.[4]

The CSE reconvened on June 20, 2000. At that meeting, the CSE recommended that L.G. be placed in a BOCES 12:1:1 program at the Spackenkill High School. The CSE recommended that L.G. pursue an academic diploma. As of June 20, plaintiffs had not yet visited this program. The 2000-01 IEP also recommended multiple sessions per week of related services as well, including speech/language therapy, occupational therapy, and independent monthly oral motor

---

[2] The record is not clear about when this happened. Plaintiffs' Rule 56.1 Statement intimates – but does not state –  that this occurred after a CSE meeting that took place on June 20, 2001. Defendants' Rule 56.1 Statement intimates – but does not state –  that this happened at or after the April 12 meeting. I conclude, after reviewing the record, that the parents made this demand following the April 12 meeting, but well prior to the June 20 meeting.

[3] I infer this because, in defendant's Rule 56.1 Statement, the District admits that the placement recommendation it made for L.G. on June 20, 2000, was "subject to the conditions that the parents first observe the program and obtain demographic information regarding the placement." The fair inference I draw from this statement is that the parents had not received the requested information by June 20.

[4] The District argues that the parents refused to make themselves available for visits prior to the end of the 1999-2000 school year. This argument might have force if the District had obtained the requested demographic data for the parents prior to the end of that school year. The District obviously did not remedy that lack of information in a timely manner. Indeed, it is quite clear that the CSE did not have accurate demographic information about the Spackenkill program as late as June 20, because it thought the class was a 12:1:1 class, when it was smaller.

speech consultation.[5]

It is not clear from the record when the parents were given the requested demographic data about the Spackenkill program. Indeed, it is not clear that they were ever given the data; it seems they may have had to unearth the information themselves.[6] However, it is undisputed that, when they got the data, it showed that the program was not as described by the District. It was not a 12:1:1 program, but an 8:1:1 program.[7] Moreover, all the students in the class were boys, and some students exhibited problematic behaviors, such as aggression. The parents thought the proposed placement was too restrictive, in that the class was too small and all male, and that it lacked "socially appropriate peers."

Shortly before the start of the 2000-01 school year (which is to say, sometime in mid-to-late August), BOCES admitted to the Gabels that it did not have an appropriate placement for L.G. This meant that the parents had only days to secure a place for their daughter. The Chairperson of the District's CSE Program was leaving on vacation, and the alternative contact person from the CSE never responded to the Gabels' calls, so the parents obtained no assistance

---

[5] Specifically, the IEP provided for: "Speech/Language Therapy (1-1) 7 weekly/cycle 40 min. in special location; Speech/Language Therapy (5-1) 2 weekly/cycle 40 min. in special location; Occupational Therapy (5-1) 2 weekly/cycle Consult 30 minute integrated set; Occupational Therapy (1-1) 1 weekly/cycle 30 min. in special location; Independent Oral Motor Speech Consult 1 time monthly in special location; Consensus agreement to discontinue counseling during 2000/2001 school year."

[6] Based on the Rule 56.1 Statements, it appears to me that the Gabels had to go out and get the accurate demographic information for themselves. Again, defendant's Rule 56.1 Statement is telling – at Paragraph 29, defendant asserts that, in August of 2000, Mrs. Gabel contacted the CSE Chairperson to advise him that "she had been told" that the BOCES program at Spackenkill High School was an 8:1:1 class.

[7] An 8:1:1 class, as the name suggests, may have only up to eight students for every teacher and assistant, and is for students with more intensive supervision needs than those who can attend a 12:1:1 class. See 8 N.Y.C.R.R. § 200.6(g)(4).

from the District in placing L.G. Mrs. Gabel testified without contradiction that she placed calls to various schools and programs and called agencies, looking for a program for L.G. The only place that had an opening was Randolph, so the parents decided to leave their daughter there.

On August 30, 2000, plaintiffs wrote to the District, advising that they would continue their daughter at Randolph and would seek reimbursement for all costs associated with that placement, including tuition and "related services."

The District did not schedule a CSE meeting to deal with the revelation that BOCES had no appropriate place to put L.G. until after the school year began. The Committee selected September 22, 2000 as the date for the meeting. The parents were unable to attend on that date.

On October 16, 2000, plaintiffs' counsel notified the CSE Chairperson that he wanted a copy of the student's records, including test protocols, so he could review them prior to any rescheduled CSE meeting. The District failed to provide the materials to the parents' attorney, and the attorney did not renew his request until the District attempted to schedule a CSE meeting in May 2001. In short, until the 2000-2001 school year was virtually at an end, neither side did anything to move toward a new CSE meeting in order to deal with L.G.'s situation. Throughout those many months, the District did not provide L.G. with any "related services," including the related services she had been receiving pursuant to the Settlement Agreement that was signed during the prior school year.

In May 2001, the District finally provided plaintiffs' counsel with a packet of documents containing some, but not all, of the testing records that plaintiffs' counsel had requested months earlier (for example, test protocols or raw data from the administration of the 1999 Woodcock-Johnson Test). Also in May 2001, with the school year virtually complete, the District again

announced a CSE meeting to deal with L.G.'s situation. The meeting was scheduled for May 21. Again, the parents were unable to attend.

On May 17, 2001, the parents requested an Impartial Hearing, alleging that the District had failed to offer L.G. an appropriate education for the 2000-2001 school year. They also demanded an impartial hearing on the District's failure to provide L.G. with related services during that year, and sought reimbursement for the cost to them of providing those services.

The CSE meeting that had initially been noticed for May 21 was finally held on June 27, 2001, after the close of the school year. At that meeting, the parents advised the District that they had pursued several independent evaluations of their daughter, including a neuropsychological evaluation by Dr. Wilma Rosen that had begun in December 2000 and concluded in June 2001. The results of that evaluation – including selected sub-tests from the Woodcock-Johnson battery – were provided to the District as part of disclosure in connection with the impartial hearing.

The impartial hearing began on December 20, 2001. At its outset, the District conceded that L.G.'s 2000-2001 IEP was not appropriate for her according to the standards articulated under IDEA and Article 89 of the New York State Education Law. This left the IHO with four issues: whether the District was liable for L.G.'s tuition at Randolph because it was the child's pendency placement; whether the parents' placement of their daughter at Randolph was appropriate; if it was, whether any equitable considerations precluded tuition reimbursement for L.G.'s tuition at Randolph; and whether the District was obligated to provide L.G. with related services during that school year.

The IHO concluded, in an interim decision dated February 4, 2002, that he lacked subject matter jurisdiction to consider the parents' claim for related services. He concluded that 34

C.F.R.§ 300.457, the relevant IDEA regulation, did not provide a child who had been unilaterally placed in a private school with a due process right to review of a refusal to provide such services under IDEA. He further held that N.Y. Education Law § 3602-c(2) provided that a school district's refusal to provide such services to a child enrolled in a private school was reviewable only by the Commissioner of Education.

In a subsequent decision dated May 15, 2002, the IHO concluded that the District was responsible to reimburse the parents for L.G.'s tuition to Randolph. The IHO reasoned that the District had admitted that it had no appropriate placement for L.G. and that it had agreed to reimburse the parents for their unilateral placement of L.G. at Randolph for the prior year.

Both sides appealed. The SRO reversed the IHO's determination that the parents were entitled to tuition reimbursement, rejecting both their argument that Randolph was L.G.'s pendency placement and that Randolph was an appropriate unilateral placement. The SRO also reversed the IHO's conclusion that he lacked jurisdiction to deal with the issue of reimbursement for services, and ordered the District to provide services for L.G. He concluded that the parents were entitled to due process review under the relevant IDEA regulations.

The parties filed separate actions in this Court appealing various aspects of the SRO's decision, which I consolidated under this, the lower index number.

**Standards for IDEA Litigation**

*General Standard of Review*

The SRO's decision is subject to independent judicial review. However, as the United States Supreme Court has cautioned, this fact "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities. . ."

Board of Education v. Rowley, 458 U.S. 176, 206 (1982). Federal courts may not simply rubber stamp administrative decisions, but they must give "due weight" to the results of administrative proceedings, mindful that judges lack the specialized knowledge and experience required to resolve persistent and difficult questions of educational policy. Walczak v. Florida Union Free School Dist., 142 F.3d 119, 129 (2d Cir. 2001). The weight to be given to the administrative decisions is at least in part a function of the thoroughness and carefulness of the administrative review process. Id.

In this case, there is a pendency placement claim for tuition reimbursement. As this question depends on an interpretation of the Settlement Agreement between the parents and the defendant District, there is no reason for deference. This Court is as able as any IHO or SRO to interpret the terms of a contract and the legal precedents relating to pendency placement.

*Tuition Reimbursement Claims*

Where, as here, we are dealing with the question of reimbursement for a unilateral parental placement, the rules are clear. A Board of Education may be required to pay for educational services obtained for a student by his or her parent, if (i) the services offered by the board of education were inadequate or inappropriate, (ii) the services selected by the parent were appropriate, and (iii) equitable considerations support the parents' claim. Burlington School Committee v. Dept. of Education, 471 U.S. 359 (1985). The district bears the burden of proof on the first issue; the parents have the burden of proof on the others. M.S. v. Board of Educ. of the City School Dist. of Yonkers, 231 F.3d 96, 102, 104 (2d Cir. 2000).

In assessing whether a district's plan afforded a child a free appropriate public education (FAPE), two issues are relevant: whether the state complied with the procedural requirements of

IDEA and whether the challenged IEP was "reasonably calculated to enable the child to receive educational benefits." Rowley, *supra*, 458 U.S. at 206-07. The District must satisfy its burden on both issues.

In this case, the District conceded that it did not provide L.G. with a FAPE, so that issue drops out of the case.

Finally, a school district may also be required to pay for private school tuition if the private school is the child's "pendency" or "stay put" placement at the time the impartial hearing is requested. I will address the issue of pendency first.

<u>Randoph Was L.G.'s Pendency Placement</u>

The pendency provisions of IDEA and the New York State Education Law require that a student remain in his or her then current educational placement, unless the student's parents and the board of education otherwise agree, during the pendency of any proceedings relating to the identification, evaluation or placement of the student. 20 U.S.C. §1415(j); 34 C.F.R. § 300.514; N.Y. Education L. § 4404(4). Pendency has the effect of an automatic injunction, which is imposed without regard to such factors as irreparable harm, likelihood of success on the merits, and a balancing of the hardships. <u>Zvi D. v. Ambach</u>, 694 F.2d 904 (2d Cir. 1982). The purpose of the pendency provision is to provide stability and consistency in the education of a student with a disability. <u>Honig v. Doe</u>, 484 U.S. 305 (1987).

Under IDEA, the pendency inquiry focuses on identifying the student's then current educational placement. <u>Zvi D.</u>, *supra*, 694 F.2d at 906. Although not defined by statute, the phrase "then current placement" has been found to mean the last agreed upon placement at the moment when the due process proceeding is commenced. <u>Murphy v. Board of Education</u>, 86 F.

12

Supp. 2d 354, 359 (S.D.N.Y. 2000), *aff'd*, 297 F.3d 195 (2d Cir. 2002). The pendency placement may or may not be the placement that is determined to be the appropriate educational placement for the child at the conclusion of the impartial hearing.

The United States Department of Education has opined that a child's then current educational placement would "generally be taken to mean current special education and related services provided in accordance with a child's most recent [IEP]." Susquenita School District v. Ralee S., 96 F.3d 78 (3d Cir. 1996). Therefore, the pendency placement is generally the last unchallenged IEP. However, if there is an agreement between the parties on placement during the proceedings, it need not be reduced to a new IEP, and it can supercede the prior unchallenged IEP as the then current placement. Bd. of Education v. Schutz, 137 F. Supp. 2d 83 (N.D.N.Y.2001), *aff'd*, 290 F.3d 476, 484 (2d Cir. 2002), *cert. denied*, 123 S. Ct. 1284 (2003).

Here, L.G.'s last agreed-upon IEP placed her at the Haviland School. However, that IEP was superceded by the Settlement Agreement. The Settlement Agreement placed her at Randolph.

Once a pendency placement has been established, it can only be changed by an agreement of the parties, an impartial hearing officer's decision that is not appealed, or a decision of a state review officer that agrees with the child's parents, 34 C.F.R. § 300.514(c); 8 NYCRR § 200.5(l)(2), or determination by a court. Schutz, 290 F.3d 476, 484 (2d Cir. 2002), *cert. denied*, 123 S. Ct. 1284 (2003); Bd. of Educ. v. Engwiller, 170 F. Supp. 2d 410, 415 (S.D.N.Y. 2001). An agreement in which a Board of Education agrees to pay tuition to a private school makes that school the child's pendency placement unless the stipulation is explicitly limited to a specific school year or definite time period. Zvi D., *supra*, 694 F.2d at 908.

Here the SRO determined that Randolph was not L.G.'s pendency placement because, in his view, the language of the Settlement Agreement limited L.G. to just one year at Randolph. The SRO believed that the language of the Settlement Agreement was functionally equivalent to the settlement language that was held not to create a pendency placement in <u>Zvi D</u>.

In <u>Zvi D.</u>, the parties entered into a settlement agreement that obligated the defendant District to pay for the student's private school education for the 1978-79 school year. The agreement contained the following language: "This funding is being provided with the stipulation that a review of Zvi's classification will be conducted at the end of the current year *with a view toward placing him in an appropriate public program in September 1979.*" 694 F.2d at 907. This language clearly indicated that the parties contemplated placing the child back in the public school in the next school year, and equally clearly conditioned District's agreement to pay private school tuition for 1978-79 on that understanding.

In our case, by contrast, the Settlement Agreement provides that the parties would settle the pending dispute by, *inter alia*, agreeing that the District would pay L.G.'s tuition at Randolph for the year in dispute (1999-2000). It does not condition that payment on any other understanding, as did the settlement agreement in <u>Zvi D.</u> Moreover, while the Settlement Agreement also contained a provision obligating the CSE to meet and review L.G.'s situation for the following year, that provision added nothing to the CSE's existing obligation or the parents' existing rights. As long as L.G. was a classified student, the CSE was required to meet and reconsider her situation.

Moreover, unlike the provision in <u>Zvi D.</u>, the "we will meet and review" provision in the instant Settlement Agreement does not contemplate the student's return to public school. Instead,

14

it obligated the District to provide plaintiffs with "information as to *all programs that would be appropriate to consider* for the child's placement for the 2000-01 school year." (Emphasis added.) The Agreement clearly contemplates a review of multiple programs prior to devising an IEP for L.G. for the 2000-01 school year. And it does not explicitly provide, as did the agreement in Zvi D., that those programs would be based in the  public school.

These critical differences in the language of the two settlement agreements requires a different result on the pendency question in this case from the one reached in Zvi D., and renders the SRO's decision on pendency erroneous as a matter of law.

This conclusion is all but compelled by the fact that, if Randolph is not L.G.'s pendency placement, she has no pendency placement (an impossible result). The District arrived at the impartial hearing and promptly announced that L.G.'s IEP for 2000-01, which provided for placement in an 8:1:1 all-male class at Spackenkill, was not appropriate. It is undisputed that the parents were advised only days prior to the opening of the 2000-01 school year that the District did not have any placement for their daughter.  The District was not recommending continuation of the placement in L.G.'s last agreed-upon IEP. So the only alternative to a private school placement was to school L.G. at home. L.G  was never home schooled, and the District has produced no agreed-upon or court-ordered IEP providing for home schooling.

Since (1) there has to be some pendency; (2) the United States Supreme Court concluded in Honig that Congress, in passing IDEA's stay-put provision, expressed a preference for educational stability and consistency; (3) Randolph provided stability and consistency; and (4) there is no other possible pendency, I conclude that the District is obligated to pay L.G.'s tuition at Randolph for the 2000-01 school year because that school is her pendency placement.

<u>The Parents Have Shown that Randolph Was An</u>
<u>Appropriate Placement For Their Daughter</u>

In the alternative, I also reverse the SRO's conclusion that the parents failed to prove that Randolph was an appropriate placement for their daughter.

The burden of proving that the school chosen by the parents for a unilateral placement is appropriate is stringent but not impossible to meet. The test for the parents' private placement is that it is appropriate, not that it is perfect. <u>M.S. v. Board of Education of City School District of City of Yonkers</u>, 231 F.3d 96, 105 (2d Cir. 2000), *cert. denied*, 532 U.S. 942 (2001); *<u>see also</u>* <u>Warren G. v. Cumberland County School District</u>, 190 F.3d 80, 84 (3d Cir. 1999). The parents satisfy their <u>Burlington</u> burden, *supra*, 471 U.S. 359, by showing that their unilateral placement offered an educational program that met their child's special needs. <u>M.S.</u>, *supra*, 231 F.3d at 102; <u>Walczak</u>, *supra*, 142 F.3d at 149. The parents' unilateral placement need not have certified special education teachers or an IEP for the disabled student in order to qualify as appropriate. <u>Florence County School District Four v. Carter</u>, 510 U.S. 7, 14 (1993).

Moreover, while students with disabilities should be educated in the least restrictive environment, 20 U.S.C. § 1412(a)(5), parents are not held to the same strict standard of placement as school districts are. <u>See</u> <u>M.S.</u>, *supra*, 231 F.3d at 105; <u>Rafferty v. Cranston Public School Committee</u>, 315 F.3d 21, 26-27 (1ˢᵗ Cir. 2002). While a court may consider the least restrictive environment issue, a parent's inability to place his child in the least restrictive environment does not bar parental reimbursement. <u>M.S.</u>, *supra*, 231 F.3d at 105 (citing <u>Cleveland Heights-University Heights City School Dist. v. Boss</u>, 144 F.3d 391, 400 (6ᵗʰ Cir. 1998)).

In this case, the SRO decided that the parents had not discharged their burden for three

16

separate reasons. I find none of those reasons persuasive.

The SRO first found that "the student did not progress while she attended Randolph and in fact, her academic performance deteriorated in the areas of reading comprehension and math calculation, as evidenced by comparing the results of the Woodcock-Johnson Psychoeducational Battery Revised Tests of Achievement administered in June 2001, while she attended Randolph, to the Woodcock-Johnson Tests of Achievement results obtained in June 1999, at which time she attended petitioner's school." The parents urge that this conclusion is wrong. They have submitted an affidavit from Dr. Wilma G. Rosen, the psychologist who administered the Woodcock-Johnson to L.G. in 2001.[8] Dr. Rosen takes issue with the SRO's reliance on the supposed decline in L.G.'s performance on the Woodcock-Johnson. Analyzing the SRO's opinion, Dr. Rosen concluded that the SRO's analysis was predicated on L.G.'s answers to two questions on the "Passage Computation" subtest, and opined that is was "psychometrically unsound and folly to judge a deterioration in reading comprehension based on two questions." (Rosen Aff. ¶ 4.)

I conclude that the SRO's reliance on L.G.'s performance on a single standardized test in determining whether her performance had improved or not was error. There is considerable evidence in the record indicating that L.G. made real progress during her second year at Randolph, including unrebutted evidence that she progressed from a seventh grade to an adult reading level during the course of the 2000-01 school year. In view of this evidence, I find Dr.

---

[8] Dr. Rosen's affidavit is not part of the administrative record, but the Court is empowered to consider it nonetheless, pursuant to 20 U.S.C. § 1415(i)(2)(B)(i)-(iii). Since Dr. Rosen takes issue with the SRO's interpretation of the test she administered, I deem it appropriate to consider her affidavit in determining this motion.

Rosen's affidavit persuasive. Additionally, there is evidence in the record suggesting that the decline in L.G.'s test score could be attributable to the fact that an unfamiliar person (Dr. Rosen) gave her the test in 2001, while a very familiar person (her special education teacher) administered the test in 1999. The SRO did not even bother to discuss this evidence.

The SRO next found that "respondents failed to establish that the student's speech-language therapy and occupational therapy needs were appropriately addressed by Randolph." The SRO is correct that Randolph did not itself provide the related services that the CSE contemplated for L.G. – that is why the District had agreed to provide those services to her at its expense during the previous school year, when L.G. was also at Randolph. However, the administrative record includes considerable unrebutted evidence, which the court credits, that L.G. made substantial progress in her speech and language skills during the 2000-01 school year, despite the District's failure to provide her with any related services.

Finally, the SRO held, "Although the student was 16 years old, respondents placed her with classmates who were between three and four years younger." But as plaintiffs point out, in her last acceptable IEP (for the 1998-99 school year), the District obviously believed that such a placement was appropriate, because it did exactly the same thing. And in a year (2000-01) when L.G.'s chronological age would ordinarily place her in her junior year in high school, the parties were at least discussing and IEP that would place her with high school freshmen, who would have been 2-3 years younger than she was. The SRO does not discuss L.G.'s social development status or otherwise explain why, in view of her prior placements, placement with younger students had suddenly become inappropriate.

The evidence concerning her year at Randolph persuades this Court that L.G. did well

with students who were a few years younger in chronological age. Testimony from Randolph witnesses established that L.G. was performing at the level of a fifth or beginning sixth grade student in September 2000, so placing her with Randolph's middle school students was skills-appropriate, if not age appropriate. The SRO's overemphasis on an "age appropriate" placement seems misplaced at a time when "social promotion" is being de-emphasized in favor of skills mastery.

Relying on the above three findings, the SRO did not discuss the considerable additional evidence that the parents submitted concerning their daughter's progress during the 2000-01 school year at Randolph. The undisputed evidence demonstrates that L.G.'s confidence level rose during her tenure at the school, she produced increasing amounts of work, became more confident and relaxed in her speech communication, began to reach out to peers and engaged in hand-on activities. During the 2000-2001 school year, L.G. progressed from a seventh grade to an adult reading level, she made progress in her writing, spelling, grammar and punctuation. She wrote books and stories. She developed analytical skills. She worked on an eighth grade math curriculum, estimating distance, studying the Pythagorean theory, geometry, calculating surface area, columes and grafting. She studied seventh grade science. Her 1:1 work with her special education teacher, Mrs. Stone, resulted in further progress. L.G. also participated in outdoor activities.

None of this evidence was disputed by the District. None of it appears to have factored into the SRO's decision. I conclude that it is appropriate to consider all of this evidence. All of it compels me to conclude that Randolph was an appropriate placement for L.G.

*Equitable Considerations*

The SRO did not reach the issue of equitable considerations, because he concluded that the parents had not satisfied their burden of proving that Randolph was an appropriate placement. Since I have reversed the SRO on this point as well, I must address this issue. I conclude without difficulty that the equities are overwhelmingly on the side of the parents, not the District.

The undisputed evidence shows the following:

1. The District ultimately acquiesced in the parents' unilateral placement of their daughter in Randolph for the 1999-2000 school year.

2. Although the District promised, in the Settlement Agreement (¶ 13), that it would provide the parents information about all programs that it would be appropriate to consider "in advance of" the CSE meeting scheduled for March 29, 2000, the District did not provide the parents information about the program it most wanted the parents to consider – the Spackenkill 12:1:1 program (which was in fact an 8:1:1 program) – until late summer, if at all.

3. Although the District argues that the parents delayed their approval of a referral to Spackenkill until it was too late for them to observe classes (due to summer vacation), in fact the District did not provide plaintiffs with demographic and class profile data concerning that program until after the end of the 1999-2000 school year. The District's proposed IEP recommending Spackenkill to the Gabels was not adopted by the CSE until June 20, 2000 – after the end of the school year – and the very recommendation passed by the CSE recognized that the District still needed to provide the Gabels with the necessary data.

4. The program recommended by the CSE did not exist.

5. The Gabels had to gather most of the information about the Spackenkill program by

themselves.

6. With but two weeks to go prior to the start of the school year, BOCES admitted that it did not have an appropriate program for L.G.

7. The District's CSE did nothing to assist the Gabels in finding an emergency placement for their daughter after dropping this bombshell.

8. The District failed to provide plaintiffs' lawyer with requested data that it was legally obligated to provide, and then did not follow up for almost seven months to ensure that data it allegedly sent had been received.

9. The CSE made no effort to convene between October 2000 and May 2001, although the District was legally obligated to have an IEP in place for L.G.

10. The District admitted that the IEP it had devised in June 2000 did not comply with the District's obligations under the law.

That the parents may have taken advantage of some of the District's lapses is beyond cavil. For example, it does not appear that the parents' lawyer followed up on his request for documents or demanded that the CSE convene for seven months, either; when he received nothing from the District, the parents were content to let the clock tick. And I am reasonably certain that the Gabels were perfectly happy to be "forced" to keep L.G. at Randolph for the 2000-01 school year, due to the District's belated admission that BOCES had no appropriate placement for the girl. However, the District's utter abdication of its responsibility to provide L.G. with a FAPE is so clear from the record – and the law's imposition of this duty on the District is so well-settled – that I must conclude that the equities favor the parents.

*Related Services Claim*

Plaintiffs also seek reimbursement for "related services" that they provided to their daughter – in the form of speech and occupational therapy – which, they argue, were not provided to L.G. by the District. The District appeals from the SRO's order directing that these expenses be reimbursed, and asks that I reinstate the IHO's determination that he (and by implication the SRO) had no jurisdiction over the entire issue of related services.

The SRO concluded that 34 C.F.R. § 300.403(b) required the impartial hearing officer to address the issue of reimbursement for related services as well as for tuition at a private school if the local educational agency (LEA) did not provide the child with a FAPE. He further concluded, based on IDEA, that the parents were entitled to reimbursement for the related services called for in her 2000-01 IEP (speech-language therapy, occupational therapy and oral motor speech consultations).

After a painstaking analysis of both federal and state law (as to which all parties' briefs were decidedly unhelpful) I conclude that both the SRO and the IHO were wrong. The SRO was wrong because the student had no right under federal law to an impartial hearing on any issue relating to the denial of "related services" (as opposed to a FAPE). Therefore, his analysis of the parents' right to reimbursement, which is squarely predicated on IDEA, is wrong and must be vacated.

The District's cross-motion seeking reinstatement of the IHO's decision must be denied, however, because the IHO was also in error. He did have jurisdiction to make a determination, pursuant to state law, of questions relating to related services for a private school student. Moreover, once that determination is made, this Court cannot review it on the merits. Such review is the exclusive province of the State Education Commissioner.

The parents contend that 34 C.F.R. § 300.403 entitles them to reimbursement for both the cost of private school and the cost of privately-provided "related service," and thus gives them a due process right to a hearing if they are denied such reimbursement. The IHO did not discuss this federal regulation in his decision. The SRO agreed with the parents.

But the text of that regulation does not support the parents' argument or the SRO's conclusion. And a review of all pertinent federal regulations reveals that the SRO's determination is erroneous as a matter of federal law.

Section 300.403(b), the section cited by the plaintiffs and the SRO, does indeed provide that, "Disagreements between a parent and a public agency regarding the availability of a program appropriate for the child, and the question of financial responsibility, are subject to the due process procedures of §§ 300.450 - 300.517." However, § 300.403(c) provides, "If the parents of a child with a disability, who previously received special education and related services under the authority of a public school agency, enroll the child in a private . . . school without the consent or of referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost *of that enrollment*. . ." ( i.e., the private school tuition, which is the cost of *that enrollment*) (emphasis added). This section of the IDEA regulations says nothing about reimbursement for the cost of "related services." Those services are mentioned only as something that the student might have received prior to a parent's unilateral enrollment of his child in a private school.

The right to reimbursement for the cost of related services obtained by the parents is addressed in a different section of the IDEA regulations, §§ 300.452 - 300.462. Section 300.452

provides:

> To the extent consistent with their number and location in the State, provision must be made for the participation of private school children with disabilities in the program assisted or carried out under Part B of the Act [IDEA] by providing them with special education and related services in accordance with §§ 300.453-300.462.

This section appears to require that the State (not individual school districts) offer special education and related services to private school students. That the obligation imposed by this section rests with the State and not the school district is confirmed by subsection (b) of this regulation, which directs State Education Agencies (SEA) – not the LEA (the school district) – to ensure that a "services plan" is developed and implemented for any private school child with a disability who is designated to receive special education services *and related services* under the IDEA regulations.

In the State of New York, the Legislature made provision for the State's compliance with this procedure by passing Education Law § 3602-c(2) – the law on which the IHO relied in reaching his decision. That section, insofar as is relevant, delegates to the school districts, and specifically to the CSEs, the obligation of devising a "services plan" for students resident within the district.

Under federal law, the right of a private school student to receive "related services" is in fact extremely limited. Section 300.454(1) of the IDEA regulations provides: "No private school child with a disability has an individual right to receive some or all of the special education and related services that the child would receive if enrolled in a public school." §300.455(2) provides: "Private school children with disabilities may receive a different amount of services than children with disabilities in public schools." And § 300.455(3) states: "No private school

child with a disability is entitled to any service or to any amount of service the child would receive if enrolled in a public school." The regulations set out a formula for the amount that a school district is required to set aside for the provision of such services to private school children (§ 300.453) and permits the district to make decisions about whether to fund such services for any particular child, ". . . in light of funding under § 300.453, the number of private school children with disabilities, the needs of private school children with disabilities, and their location."

Finally, and most significantly for our purposes, as the IHO observed, § 300.457 of the IDEA regulations specifically provides that the due process procedures contained in IDEA and its regulations – including the right to an impartial hearing – do not apply to any failure by an LEA
(school district) to provide services "indicated on the child's services plan." Since the regulations clearly indicate that no private school student has a right to publicly funded special education or related services from a school district, this provision makes perfect sense.

The SRO concluded that he had jurisdiction because he believed that the related services called for in L.G.'s IEP were part and parcel of her FAPE. The SRO, and plaintiffs in their moving papers, cite various SRO (not court) decisions holding that school districts have failed to provide particular pupils with a FAPE "including related services." From this, the SRO reasoned – and the parents reason to me – that "related services" must be comprehended within the FAPE. And since the parents' right to a FAPE for their child is subject to due process review, the SRO and the parents reason that reimbursement for the "related services" component of a FAPE must be reviewable as well.

But it is clear from the IDEA regulations (which are not discussed at any length in either the SRO's decision or in the parents' briefs) that related services simply do not stand on the same footing as private school tuition when it comes to reimbursement under IDEA. A school district cannot deny a child a FAPE, and if it cannot provide a FAPE in a public school setting, it must pay for the child's private *education*. But a district can deny or limit related services (i.e., services related to the child's education, as opposed to the education itself) to any child who is enrolled in private school. The implementing regulations make no exception to this rule for a child like L.G., who is enrolled in private school only because the District is unable to provide that child with a FAPE in a public school setting. Indeed, whether the child is in private school with the District's consent or over its objection does not appear to matter.

Because IDEA and its corresponding regulations clearly and explicitly do not confer on L.G.'s parents the right to any due process hearing if related services are not provided or paid for, the SRO's conclusion to the contrary was erroneous and must be vacated.

> The IHO's Decision Concerning
> Lack of Jurisdiction Is Also Erroneous

The question then becomes what to do about the parents' request for reimbursement for related services. The District asks that I reinstate the IHO's original decision, in which he concluded that he lacked jurisdiction over the parents' claim for related services because New York's Education Law § 3602-c(2), vested exclusive jurisdiction over related services issues in the State Commissioner of Education. But I cannot reinstate the IHO's decision because his conclusion – while perfectly understandable given certain language in § 3602-c(2) – was wrong. He did have jurisdiction to conduct an impartial hearing on this issue. And he was required to do so.

Education Law § 3602-c is entitled "Apportionment of moneys to school districts for the provision of services to pupils attending nonpublic schools." As noted above, it is the provision passed by the Legislature to respond to the IDEA regulations concerning related services, which are the responsibility of the State. It provides, in substance, that certain services (including "education for students with handicapping conditions, and counseling, psychological and social work services related to such instruction") shall be provided by boards of education to students residing in their district who attend private schools "located in such school districts" if the student's parents so request.[9]

For students like L.G., with handicapping conditions, CSE review of parental requests for related services is required. It is undisputed that the CSE did review a request from plaintiffs for the provision of related services for the 2000-2001 school year and recommended, as the SRO found, that speech and occupational therapy be provided by the District to L.G.

Section 3602-c(2) affords the parents of an affected student who are dissatisfied with the CSE's recommendation the right to "review of the recommendation of the committee on special education. . . pursuant to the provisions of section forty-four hundred four of this chapter." Education Law § 4404 mirrors the IDEA due process provisions, in that it provides for an impartial hearing, appointment of an IHO, further administrative review by an SRO, and ultimate appeal to a court.

Section 3602-c(2) also states: "The failure or refusal of a board of education to provide

---

[9] When students resident in one district attend private school in a different district – which is what happened here (Randolph not being in the Hyde Park School District) – § 3602-c(2) mandates that the school district of residence enter into a contract with the school district where the private school is located in order to provide those services.

such services in accordance with a proper request shall be reviewable only by the commissioner upon an appeal brought pursuant to the provisions of section three hundred ten of this chapter." This is the language on which the IHO relied in concluding that he had no jurisdiction to conduct an impartial hearing on the issue of related services.

On its face, this language does appear to conflict with the same section's clearly delineated right of the parents to obtain review of a CSE's refusal to recommend the provision of related services through an impartial hearing. Saying that "only" the Commissioner can review the board's refusal does indeed suggest that parents have no right to an impartial hearing – whatever the law says only three sentences earlier.

However, this apparent conflict can be, and has been, reconciled by the Commissioner himself. In Decision No. 12,530, 30 Educ. Dept. Rep. 448 (1991),[10] a parent appealed directly to the State Education Commissioner from a school district's refusal to provide "related services" to the parent's daughter while she was attending a private school. The Commissioner indicated that the petition would have to be dismissed on multiple grounds, one of which was, "for failure to exhaust administrative remedies, as required by Education Law § 4404. . ." The Commissioner held that an impartial hearing pursuant to that section of the Education Law, and review of the IHO's decision by an SRO, had to occur before a dispute over the provision of related services to a private school student could be submitted to him for review:

Petitioner had the option, if dissatisfied with respondent's evaluation

---

[10] The Court obtained a copy of the Commissioner's decision from the State Education Commissioner after seeing a citation to it in McKinney's Vol. 16, (Education Law § 310) at Notes of Decisions ¶ 118. According to the General Counsel of the State Department of Education, the Commissioner did not begin publishing these decisions until Volume 31. A copy of Decision No. 12,530 is attached to this opinion.

of her daughter, to request an impartial hearing to review the district's action. The proper administrative procedure for challenging a district's failure to provide related services to a handicapped child is an impartial hearing. . . as my earlier decision emphasized, compliance with due process procedures is essential to develop a record from which an informed decision can be made regarding petitioner's substantive claim.[11]

So the IHO was in error when he concluded that he did not have jurisdiction over the parents' appeal from the district's denial of reimbursement for related services. He did, and the SRO had intermediate appellate jusirdiction.

<u>State Law Does Not Permit This or Any<br>Court To Exercise Jurisdiction Over A "Related<br>Services" Appeal For a Private School Student</u>

The only party who does not have and will never have any jurisdiction over plaintiffs' claim for reimbursement for related services is I.

What the Commissioner's Decision 12,530 makes clear is that no court, including this Court, has jurisdiction over an appeal relating to this issue. IDEA confers no jurisdiction on this Court because it confers no right of due process review on this issue. State law – the only law that gives L.G. the right to any due process review of a decision denying related services to a private school student – provides that an administrative determination after impartial hearing concerning related services is reviewable only by the Commissioner. § 3602-c(2). All other determinations made by IHOs and SROs are reviewable by a court, <u>see</u> Educ. L. § 4404, but not determinations concerning the provision of "related services." The reference to review "only" by the Commissioner was obviously intended to take the courts entirely out of the review

---

[11] Significantly, the Commissioner noted that the parent had filed a direct appeal with the Commissioner a year earlier, which appeal had been dismissed as premature because of the parent's failure to exhaust administrative remedies pursuant to Educ. L. § 4404.

process where related services are concerned.

This means that I cannot consider the merits of any administrative decision – no matter who made it or what it is – concerning the District's failure to provide "related services" to L.G. for the 2000-01 school year.

Since I must vacate the SRO's decision (because it rests on a demonstrably erroneous interpretation of the relevant federal regulations) but cannot reinstate the IHO's decision (because it rests on a demonstrably erroneous interpretation of state law), the question becomes what to do in order to keep the related services issue from languishing in some legal limbo. I conclude that the appropriate course is to remand this matter to the SRO so he can address the merits of the parents' request without regard to any non-existent IDEA due process right. If the parents are dissatisfied with that decision, they will have to take the matter to the State Education Commissioner.

**The Rehabilitation Act Claim**

In their complaint, the parents allege that the District is also liable to them for violating Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794. The District seeks summary judgment dismissing that claim. The District's motion is denied.

IDEA and Section 504 are complementary, but they address different injuries and thus require different proof. Specifically, Section 504 offers relief from discrimination, whereas IDEA offers relief from inappropriate educational placement, regardless of discrimination. See, e.g., Wenger, 979 F. Supp. 147, 152 (N.D.N.Y. 1997). Thus, denial of *access* to an appropriate educational program on the basis of a disability is a Section 504 issue, whereas dissatisfaction with the *content* of an IEP would fall within the purview of IDEA. See, e.g., Zahran v. New

York Dep't of Educ., 306 F. Supp. 2d 204, 212-14 (N.D.N.Y. 2004).

Section 504 prohibits an entity that receives federal financial assistance – for example, a school district[12] – from discriminating against students solely on the basis of disability:

> No otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance . . .

According to regulations promulgated under Section 504, a school system is required to provide disabled students with a FAPE, which, for purposes of Section 504 means:

> the provision of educational and related services without cost to the handicapped person or to his or her parents . . . It may consist either of the provision of free services, or, if a recipient [school district] places a handicapped person or refers such person for aid, benefits, or services not operated or provided by the recipient . . . , of payment for the costs of the aid, benefits, or services.

34 C.F.R. § 104.33(c)(1).

A party asserting a claim under Section 504 must prove: (1) that the student is disabled; (2) that the student is "otherwise qualified" to participate in school activities; (3) the school or the board receives federal financial assistance; and (4) the student was excluded from participation in, denied the benefits of, or subject to discrimination at, the school. See, e.g., D'Amico v. City of New York, 132 F.3d 145 (2d Cir. 1998); see also Zahran, 306 F. Supp. 2d at 212; B.D. v. DeBuono, 130 F. Supp. 2d 401, 438 (S.D.N.Y. 2000); W.B. v. Matula, 67 F.3d 484, 499-500 (3d Cir. 1995).

Since Section 504 relief is conditioned on a showing of discrimination, it requires something more than proof of a mere violation of IDEA – i.e., more than a faulty IEP. J.P. v.

---

[12] Section 504 specifically applies to "school systems" that receive federal financial assistance by way of 29 U.S.C. § 794(b)(2)(B).

Pawlet School Dist., 224 F.3d 60, 70 (2d Cir. 2000); see also R.B. v. Board of Educ. of the City of New York, 99 F. Supp. 2d 411, 419 (S.D.N.Y. 2000). As Judge Scullin in the Northern District of New York has held, "a plaintiff must demonstrate that a school district acted with bad faith or gross misjudgment." Butler v. South Glens Falls Cent. Sch. Dist., 106 F. Supp. 2d 414, 420 (N.D.N.Y. 2000) (quoting Brantley v. Independent School Dist. No. 625, 936 F. Supp. 649, 657 (D. Minn. 1996)). The plaintiff is not required to show personal animosity or ill will. Rather, intentional discrimination may be inferred when a school district acts with gross negligence or reckless indifference in depriving a child of access to a FAPE. See, e.g., R.B., 99 F. Supp. 2d at 419; Butler, 106 F. Supp. at 420 (citation omitted).

In the case before me, the District concedes many errors – discussed at length above – with respect to the placement of L.G. for the 1999-2000 and 2000-01 school years. The District urges, nevertheless, that there is no evidence of bad faith or gross misjudgment in the record, and that the parents' claim for compensatory damages under Section 504 must be summarily dismissed.

The Gabels also believe that summary judgment is appropriate, but in their favor. They urge, in essence, that the factors on which this Court relied in concluding that the equities entitled L.G.'s parents to tuition reimbursement (*supra* at pp. 20-22) are sufficient to evidence the District's bad faith and deliberate indifference.

I can only grant the District's motion if I conclude, as a matter of law, that no reasonable juror could find that the District's numerous errors in handling LG.'s case – conceded or not – do not rise to the level of gross negligence or reckless indifference. Frankly, I cannot make such a finding. Case law from this Circuit suggests that the District's many failures may rise to the level

of gross negligence or reckless indifference sufficient to support a claim of discrimination under Section 504.

In R.B., Judge Pauley (of the Southern District of New York) denied a motion to dismiss a Section 504 claim brought on behalf of a student with a speech impairment and aggressive tendencies who was completely excluded from the classroom for an entire year because of actions by the school board that amounted to, in the IHO's words, "gross neglect, incompetence and ineptitude." 99 F. Supp. 2d at 419. Specifically, the board in that case had (1) recommended placement in a private school and then failed to secure such a placement (for which it was responsible under the applicable IEP); (2) failed to return the parent's calls when she attempted to determine the status of the child's placement; (3) waited until school was about to start before alerting the parent to the lack of appropriate programs; (4) placed the student in an inappropriate program which resulted in the student's prompt acting out and subsequent suspension from the program; (5) failed to promptly develop an interim services plan (ISP) after the student was suspended; and (6) failed to timely implement the ISP that finally was developed. The result was that the student was completely excluded from the classroom for the entire 1996-97 school year and received at-home services only towards the end of the school year. Id. at 414-16. The parent contended that the student had suffered immeasurable harm, becoming withdrawn, overweight, and depressed. Judge Pauley held the student had alleged sufficient evidence of "bad faith" and "gross misjudgment" to withstand a motion to dismiss. Id. at 419.

In P.C. v. McLaughlin, 913 F.2d 1033, 1041-42 (2d Cir. 1990), on the other hand, the Second Circuit granted summary judgment dismissing Section 504 claims against state mental

health officials brought on behalf of a mildly retarded young man primarily on the basis that no actual discrimination had been alleged.[13] The plaintiff had been moved in and out of several different residential programs at the request caregivers who could not handle his antisocial and aggressive behavior. Plaintiff claimed that the multiple transfers had the effect of depriving him of access to benefits provided to other disabled people because the services he actually received did not meet his needs, and he further claimed that his handicapping conditions were the basis of the defendants' failure to provide the services at issue. The court disagreed with plaintiff, found that the school district had advanced legitimate reasons for moving the student, found no evidence of discriminatory animus had been presented, and held that the student had not articulated a claim that he had been denied access to appropriate programs, as required under Section 504. Id. at 1042.

In assessing plaintiff's rights, the McLaughlin court noted that Section 504 assures that handicapped individuals receive "even-handed treatment" in relation to non-handicapped individuals. Id. at 1041. The court specifically noted that Section 504 did not require the defendants to meet plaintiff's needs as compared with the needs of other handicapped individuals, but rather that plaintiff's disability could not form the basis of a denial of services available to non-handicapped individuals. Id. at 1042; see also Zahran, 306 F. Supp. 2d at 214-15 (dismissing Section 504 claim as against state department of education and local school board where development and review of IEP for autistic, aggressive student took extended period of time and resulted in his not receiving a FAPE for a period of three months, but where there were

---

[13] The defendants in that case had moved for summary judgment on the Section 504 claims on the basis of qualified immunity, to which the court held they were entitled because their actions were reasonable in light of plaintiff's clearly established rights. Id. at 1042.

no allegations of bad faith or gross misjudgment and parents challenged only the "substantive contours" of the student's program).

Unlike the plaintiffs in McLaughlin and Zahran, L.G. is complaining she was denied access to appropriate programs. And while the District's actions are admittedly not quite as egregious as those of the board in R.B., plaintiffs have alleged gross negligence in the District's many failures regarding their daughter and have adduced enough evidence of same to get them to a jury. Viewing the facts most favorably to the parents (as I must when considering the District's motion for summary judgment), L.G. had nowhere to go – i.e., no access to school – only days before the beginning of the 2000-01 school year, because the District failed, in many ways, to do its job. That her parents solved the problem and placed in her in what I have found (for IDEA purposes) to be an appropriate program does not absolve the District of liability for discrimination under Section 504.

What remains to be determined is whether L.G.'s disability was the reason the District failed to meet its obligations. On this record, it appears that the District was not only unable to address L.G.'s needs, but that it actually *avoided* dealing with her parents because it had no proper placement for her. Of course, as long as the District behaved in an "even-handed" manner toward all students – even if it was even-handedly incompetent – there is no discrimination. Here, there has been no discovery, so the factual record remains to be fleshed out. The District's motion for summary judgment is at best premature. Moreover, the District's recommendation of an 8:1:1 program for L.G. after the CSE had recommended a 12:1:1 program may in itself constitute the type of gross negligence or reckless indifference Section 504 is meant to address. See B.D., 130 F. Supp. 2d at 439-440 (finding sufficient evidence of gross negligence to

withstand summary judgment on a Section 504 claim where defendant health and education officials knew autistic plaintiffs required more than 10 hours per week of a certain autism therapy and nevertheless adopted a rule limiting that therapy to 10 hours per week per student); see also W.B., 67 F.3d at 499-500 (denying summary judgment on a Section 504 claim where mother of student eventually diagnosed with ADHD, Tourette's syndrome and obsessive compulsive disorder had to spend months trying to convince school officials to evaluate her child and over a year fighting for Section 504 services to which the child was entitled).

However, I have no basis to grant the Gabels' cross motion for summary judgment on this issue, either. Their argument appears to be that the District's blatant IDEA violation automatically rises to the level of Section 504 discrimination. They are wrong. They will have to develop an appropriate factual record concerning the District's treatment of other students if they are to prevail on their discrimination claim.

The issue of liability for related services under Section 504 – when, as here, the student has been placed in a private program – will also have to be resolved at trial. I note, however, that Section 504, unlike IDEA, does not explicitly treat basic educational services and related services differently. I suppose, therefore, that it is possible that the District could be liable to plaintiffs for the cost of the related services L.G. received while at Randolph during 2000-01, if it is determined that the District violated Section 504 in connection therewith.

## Conclusion

For the foregoing reasons, plaintiff's motion for summary judgment is granted only to the extent of the tuition reimbursement claim and is otherwise denied. Defendant's motion for summary judgment is denied in full.

This constitutes the decision and order of the Court.

Dated: May 10, 2005

_____
U.S.D.J.

BY FAX TO ALL PARTIES